UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br>     Plaintiff, ) <br> ) <br> v ) <br> ) <br> ) <br> KEWAN WATTS ) <br> ) <br>     Defendant. ) | Case No. 18 CR 743 <br> Judge Lee <br> Magistrate Judge Cole |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant, Kewan Watts, by and through his attorney, Steven H. Fine, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18 U.S.C. §3552(a), as well as the Sixth Amendment to the Constitution of the United States and the Supreme Court's opinion in *United States v Booker*, 543 U.S. 220 (2005), respectfully submits the following sentencing memorandum.

    **I.    INTRODUCTION**

The Court is no doubt familiar with the wide sentencing discretion provided under 18 U.S.C. § 3553(a) since the Supreme Court decided *United States v. Booker*, 543 U.S. 220 (2005), and reiterated that discretion in cases such as *United States v. Rita*, 551 U.S. 338 (2007), and *Gall v. United States*, 552 U.S. 38 (2007). The statutory sentencing factors found in § 3553(a) provide the Court with the framework upon which to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing by taking into account, among other things, the nature and

1

circumstances of the offenses, the history and characteristics of the defendant, and the need for the sentence imposed to satisfy the purposes of sentencing.

Based on the following § 3553(a) considerations, it is submitted that a sentence substantially below the advisory guideline range is appropriate in this case.

## II. THE 18 U.S.C. § 3553(a) FACTORS

Section 3553(a) obligates this Court to impose a sentence that is "sufficient, but not greater than necessary to comply with" the purposes of sentencing set forth by Congress. *See* 18 U.S.C. § 3553(a). Those purposes include:

- To provide just punishment that reflects the seriousness of the offense and promotes respect for the law;
- To create adequate deterrence;
- To protect the public; and
- To provide the defendant with necessary treatment and training.

In accordance with the goals of sentencing, the court considers a variety of factors under 18. U.S.C. § 3553(a), including:

- The nature and circumstances of the offense and history and characteristics of the defendant;
- The kinds of sentences available;
- The sentencing guideline range;
- Relevant policy statements by the Sentencing Commission;
- The need to avoid unwarranted sentencing disparities among defendants with similar records who engaged in similar conduct; and

2

- The need to provide restitution to victims of the offense.

The guidelines are only one of numerous factors the court must consider when imposing a sentence. Now, "n[o] limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. This Court is obligated to consider factors that the guidelines previously precluded.

It is important to note that the Seventh Circuit has recognized the sentencing judge "cannot treat all sentences that would fall within the guidelines sentencing range as reasonable *per-se*." *United States v. Cunningham*, 429 F. 3rd 673, 676 (7th Cir. 2005). This Court should impose a sentence below the advisory guideline range when that sentence conforms to the § 3553 factors. While the guidelines remain a factor in the post-*Booker* world, this Court should not presume that they will produce the "correct" sentence. *United States v. Demaree*, 459 F. 3d 791, 794-795 (7th Cir. 2006).

As a result of *Booker* and decisions that have followed, the only limitation upon this Court is that the sentence not be "unreasonable." 18 U.S.C. § 3553(a); *Booker* at 765-66; *Kimbrough v. United States*, 128 S.Ct. 558, 575 (2007); and *Gall v. United States*, 128 S.Ct. 586, 594 n.2 (2007).

**A. THE NATURE AND CIRCUMSTANCE OF THE OFFENSE FAVOR A BELOW ADVISORY GUIDELINES RANGE.**

Section 3553(a) appropriately counsels that the offending conduct be considered but only in conjunction with the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). This is because Congress has recognized that good people who make bad decisions are still good people. Moreover, Congress has recognized that the conduct cannot be looked at in isolation, just

3

as the person cannot be looked at on his own. One must look at what they did wrong and try to understand them as a person, evaluating the conduct vis-à-vis how they have otherwise lived their life.

The offense here is indeed serious, but it must be balanced against the history, character, and individualities of this Defendant. 18 U.S.C. § 3553(a)(l). Lawmakers have recognized that bad decisions do not necessarily impugn the general character of a person. Relatedly, misfortunate events can and do have the ability to affect behavior and decision-making. Congress has recognized that appropriate disciplinary action must take into account both the person and the conduct, because considered separately, neither provides a complete picture.

### B. THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT FAVOR A SENTENCE BELOW THE ADVISORY GUIDELINES RANGE.

Kewan Watts is 36 years-old and a dedicated father to all of his children. PSR 3, ¶116. Kewan was born April 24, 1984 to the non-martial union of Norvell Watts, Jr. and Karen Means-Haynes. *Id*. at ¶112. Kewan and his father had an excellent relationship. Norvell lived across the street from Kewan and his mother. Norvell also provided financial and emotional support to his son. *Id*. at ¶113. When Kewan was a young he experienced the loss of his father. *Id*. at ¶112. Kewan's father died at the very young age of 27 years-old. *Id*. at ¶112. The loss of his father was hard on Kewan. Following the death of his father, Kewan's mother married Darrell Hoskins. *Id*. at ¶113. Mr. Hoskins was disruptive to the family dynamic due to his gambling addiction and the emotional abuse he inflicted on Kewan's mother. *Id*. at ¶113. According to Kewan, Mr. Hospkins "provided me with the example for how not to behave in life." *Id*. at ¶113.

Kewan married his "high school sweetheart", Diana Lovett, on July 8, 2014, and separated in December 2019 due to "major strains" during the marriage. PSR ¶115.

4

Unquestionably a contributing factor to the separation was the death of Kewan's daughter. *Id*. at ¶115. Additionally, Ms. Lovett was diagnosed with breast cancer and emotionally withdrew from their marriage. Kewan and his high school sweetheart remained good friends until her death in July 2020. *Id.* at ¶116.

Kewan is a devoted father to his children. The defendant's mother reported that Kewan is a highly involved, loving father. PSR ¶ 113. She has observed "outstanding co-parenting" between the children's mothers and Kewan. *Id*. at ¶116. Kewan teaches his kids to be "givers" and to help those that are less fortunate. *Id.* at ¶116. Kewan's 9 year-old daughter, Khasani Watts, currently lives with him, as her mother is addicted to drugs and is unable to care for the child. *Id*. at ¶116. Before Kewan agreed to assume full custody of Khasani, she was placed with the California foster care system after being removed from her biological mother's custody. *Id*. at ¶116.

On February 11, 2015, Kewan experienced the greatest loss a parent can ever imagine. Kewan's 3 year-old daughter, Kamaya Watts, died as the result of a tragic accident. Although Kamaya was born with Down Syndrome, pulmonary hypertension and an atrial septal defect, she overcame many of the hurtles doctors predicted would impede her ability to walk and speak. PSR ¶117. Kewan and his wife worked tirelessly to ensure their daughter had the care and resources she needed to reach her full potential. The night before Kamaya died, Kewan spoke with her via Facetime to wish her a good night. *Id*. at ¶ 118. They shared a few laughs and told each other how much they loved each other. Little did Kewan know that would be the last time he would have a chance to share a laugh with his daughter. The tragic loss of his daughter was also marked the 23rd anniversary of Kewan losing his father. *Id*. at ¶118. The loss of his daughter was devastating to Kewan. He struggled with anger and depression for many years. After witnessing the pain

5

Kamaya's mother endured and the sorrow she felt for the loss of their daughter, Kewan was able to find forgiveness in his heart and found peace. *Id*. at ¶119.

With respect to Kewan's education and work experience, he graduated from Thornridge High School in 2002. PSR ¶133. In 2005, Kewan attended barbering school to earn his barbering license. *Id.* at ¶135. In addition to holding a state barbering license, Kewan underwent 1,000 additional training hours to earn a certificate to train barbers. *Id*. at ¶135. Earning a training certificate was Kewan's way of giving back to the profession that gave him the structure and discipline he developed while working in barbershops since he was ten years old. Kewan last class instruction was in 2019. *Id*. at ¶135. Since 2013, Kewan has been a co-owner of a barbershop. *Id.* at ¶137. As a result of this conviction, Kewan's barber license will likely be suspended. *Id.* at ¶137. Additionally, his 50 percent ownership of the barbershop will be forfeited when sentenced in this case. *Id*. at ¶137. The loss of his barbering license, losing his ownership in his barbershop, and the disappointment shared by his business partner is a devastating punishment for Kewan.

Turning to Kewan's instant offense, he has accepted responsibility for his conduct. While it is anticipated that Kewan will receive a three-level reduction for acceptance of responsibility, this Court can also consider this immediate and complete acceptance of responsibility as a mitigating factor under section 3553(a). *United States v. Leiskunas*, 656 F.3d 732, 737 (7th Cit. 2011). In some cases, the "one-size fits-all discount of three offense levels" is insufficient to adequately account for a defendant's remorse. *United States v. McQueen*, 2006 WL 3206150 at *7 (S.D. Ind. Apr. 20, 2006)(Hamilton, J.). In *McQueen*, the court noted that "[o]ne reason for the reduction for acceptance of responsibility is that a defendant who recognizes his wrongdoing and accepts responsibility for it is more likely to learn the lesson from the experience and more likely to avoid committing future crime." *Id*., (citing *United States v. Lopinski*, 240 F.3d 574, 575 (7th Cir. 2001); *United States v. Cunningham*, 102 F.3d 569, 599 (7th Cir. 1996); *United States v.*

*Pryor*, 32 F.3d 1192, 1195 (7th Cir. 1994)). "In other words," the court found, "a guilty defendant's immediate acceptance of responsibility is a test of character." *Id*. For these reasons, Kewan's conduct warrants additional consideration under § 3553(a).

While Kewan may not qualify for a minor role adjustment under U.S.S.G. §3B1.2, his level of involvement in the offense indicates he had less responsibility than his co-defendants. Kewan's offense conduct is consistent with low-level, short-term involvement in the scheme. The conduct, in this case, spanned from approximately November 2013 until in or about December 2015. PSR ¶15. Kewan's involvement, however, in the offense began in late February 2014 when his co-defendants recruited him. *Id*. at ¶17. Kewan did not actively seek participation in the scheme, he did not create the framework for the scheme, and he did not recruit additional members to join the scheme. Kewan had nearly no decision-making authority in relation to the offense.

Further evidence of Kewan's limited involvement in the offense is the limited number of mailing addresses he provided to the co-defendants. The government estimates that the scheme involved using the personal identification information of at least 892 individuals, but Kewan is responsible for giving the co-defendants only 31 mailing addresses in the scheme's furtherance. PSR ¶18, 21. Kewan's participant in providing the addresses accounts for roughly 3 percent of the personal information used during the scheme. Kewan's role in providing a limited number of mailing addresses to the co-defendants is indicative of his limited participation in the scheme.

. Furthermore, from late-February 2014 until Kewan's arrest in December 2015, Kewan was connected with using an IDES debit card to withdraw $580.00. Kewan was not responsible for gathering the personal identifications, creating the IDES profiles, or a significant participant in the scheme, which should factor into this Court's sentencing determination.

Looking to the future, a number of factors support the conclusion that it is unlikely Kewan will recidivate. Kewan has-in accepting responsibility for his actions-acknowledged the need to

7

make lifestyle changes.  Kewan has a strong family network that will help him achieve his goals of self-improvement during and after the completion of his sentence in this case.  He also has a professional license he will rely on to return to gainful employment upon his release from custody.

In conclusion, Kewan understands that he must be held accountable for his conduct and role in the offense.  However, a lengthy prison sentence will not achieve the sentencing goals this Court must consider in determining the appropriate punishment.  The judgment of this Court will not only, for better or worse, alter the course of Kewan's life but the lives of his children, who will be looking to him for encouragement, support, and direction.  For these reasons, Kewan implores this Court to hand down a sentence well below guideline range.  Such a sentence would reflect the seriousness of the offense and the need to deter future criminal conduct.  It will also provide Kewan with an opportunity to return home to his family, where he can provide his children with guidance and financial assistance.

### C.  THE SENTENCING GUIDELINES

The first step in sentencing a defendant is to correctly calculate the applicable guideline range. *Gall v. United States*, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); see also *United States v. Vrdolyak,* 593 F.3d 676, 678 (7th Cir. 2010). Notably, after the calculation, the court is entitled to disagree with the result of the guideline calculation and even categorically reject the Sentencing Commission's policy choices. *Spears v. United States*, 555 U.S. 261, 129 S.Ct. 840, 843-44, 172 L.Ed.2d 596 (2009); *United States v. Aguilar-Hueria*, 576 F. 3d 365, 466-67 (7th Cir.), *cert. denied*, 130 S.Ct. 811, 175 L.Ed.2d 596 (2009).

### 1.  THE DEFENDANT'S CRIMINAL HISTORY CATEGORY IS OVERSTATED

In the PSR, Kewan received 1 criminal history point for his 2017 simple possession of marijuana conviction. PSR ¶82.  The Probation Officer noted that the criminal conviction

resulted in a subtotal criminal history score of 2, or a Criminal History Category II. *Id*. ¶ 83. The defense maintains that the minor non-violent possession of cannabis conviction artificially inflates his prior criminal record. Kewan's criminal history category does not align with Category II cases, which usually consist of more serious drug offenders, violent offenses, and individuals who have dangerous criminal convictions. Further, the sentence yielded negligible punishment in the county jail. Here, Kewan received a sentence of 2 days served for his 2017 conviction.

Additionally, on June 25, 2019, Governor Pritzker signed HB 1438, which makes cannabis legal in the State of Illinois. In addition to legalizing marijuana, the bill offers relief to roughly 800,000 residents of the state with marijuana-related offenses on their criminal records. The state's new Cannabis Regulation and Tax Act allows people to automatically receive clemency for convictions up to 30 grams of cannabis. If the governor grants the pardon, the Illinois attorney general will seek expungement. Kewan's simple possession of cannabis convictions will ultimately be expunged in the very near future.

Accordingly, Kewan maintains that the simple marijuana conviction over-represents his criminal history. The more appropriate criminal history calculation results in a subtotal criminal history score of 1, a Criminal History Category I, and a total offense level of 22. The appropriate guideline imprisonment range is 41 months to 51 months' imprisonment.

## 2. THE DEFENDANT IS UNLIKELY TO RECIDIVATE.

Kewan's criminal history category is a strong indication he is unlikely to recidivate. An eight-year study of 25,431 federal offenders found, unsurprisingly, that "recidivism rates are closely correlated with total criminal history points and resulting CHC classification, as offenders with lower criminal history scores have lower recidivism rates than offenders with

9

higher criminal history scores. U.S. Sentencing Commission, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 7 (March 2017), available: http://www.ussc.gov/sites/default /files/pdf/research-and-publications/researchpublications/2017/20170309_ Recidivism-CH.pdf. Additionally, it is widely accepted that defendants, like Kewan, who have not spent any time in jail or prison generally require a shorter term of imprisonment to prevent recidivism. *See United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wisc. 2005) (Adelman, J.).

Another indication that Kewan does not pose a risk of recidivism is his conduct while on pretrial release. During Kewan's time on pretrial release, he complied with all the pretrial release conditions, and no violation reports were ever filed. Additionally, despite the perpetual fear and anxiety this case—and a looming prison sentence—has caused him, Kewan has continued to be a dedicated and conscientious father to his children, and was a supportive husband to his now-deceased spouse.

> **3. A NON-GUIDELINES SENTENCE WOULD ADEQUATELY REFLECT THE SERIOUSNESS OF THE OFFENSE AND PROMOTE RESPECT FOR THE LAW.**

As with most criminal statutes, the deterrence of others from committing similar crimes was one of Congress's goals in fashioning the sentencing guidelines. To the extent that Congress meant to deter defendants from committing further crimes, all the empirical research is in agreement that imprisonment does not reduce recidivism. *See, e.g.*, Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011) ("The results indicate that incarceration did not affect either offenders' likelihood of recidivating or the severity of recidivism."); Howard E. Barbaree *et al.*, *Canadian*

10

*Psychological Association Submission to the Senate Standing Senate Committee on Legal and Constitutional Affairs* 6 (Jan. 2012) ("Psychology researchers have identified effective methods, or 'what works', to reduce crime – the overwhelming consensus of the literature is that treatment works, incarceration does not.").[1] As Judge Roger Warren, President Emeritus of the National Center for State Courts, stated in 2007: "The research evidence is unequivocal that incarceration does not reduce offender recidivism." Roger Warren, National Center for State Courts, *Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries* 11 (2007).[2] Instead, "[i]ncarceration actually results in slightly increased rates of offender recidivism." *Id.*[3] In other words, "across the offender population, imprisonment does not have special powers in persuading the wayward to go straight. To the extent that prisons are used because of the belief that they reduce reoffending more than other penalty options, then this policy is unjustified." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) ("[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions.").

---

[1] *Available at* http://www.cpa.ca/docs/file/Government%20Relations/SenateCommitteeSubmission_January302012.pdf.

[2] *Available at* http://nicic.gov/library/files/023358.pdf.

[3] *See also* Mark W. Lipsey and Francis T. Cullen, *The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews*, 3 Ann. Rev. L. Soc. Sci. 297, 302 (2007) ("[R]esearch does not show that the aversive experience of receiving correctional sanctions greatly inhibits subsequent criminal behavior. Moreover, a significant portion of the evidence points in the opposite direction – such sanctions may increase the likelihood of recidivism. The theory of specific deterrence inherent in the politically popular and intuitively appealing view that harsher treatment of offenders dissuades them from further criminal behavior is thus not consistent with the preponderance of available evidence.").

**CONCLUSION**

Mr. Watts respectfully requests that this Court impose a reasonable sentence taking into consideration all of the information and circumstances discussed herein.

                        Respectfully submitted,

                        **s/ Steven Fine**
                        **STEVEN FINE**

**Law Office of Steven H. Fine**
53 West Jackson Boulevard, Suite 1215
Chicago, Illinois 60604
(312) 922-0855

12

## **CERTIFICATE OF SERVICE**

      I hereby certify that foregoing Defendant's Sentencing Memorandum was served on November 17, 2020, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

      **s/ Steven H. Fine**
**Steven H. Fine**
53 West Jackson Boulevard, Ste. 1215
Chicago, Illinois 60604
(312) 922-0855